Richard H. Louie and Helen L. Louie, Husband and Wife v. Commissioner.
Louie v. Commissioner
Docket No. 53341.
United States Tax Court
T.C. Memo 1956-117; 1956 Tax Ct. Memo LEXIS 178; 15 T.C.M. (CCH) 586; T.C.M. (RIA) 56117; May 15, 1956
*178 Conrad T. Hubner, Esq., 68 Post Street, San Francisco, Calif., and Ralph A. Taylor, Esq., for the petitioners. Clyde R. Maxwell, Jr., Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency in income tax for 1950 of $17,860.66. The issues raised are principally related to whether petitioner held certain real property as trustee for himself, his brothers, and his sisters, or whether he personally owned an eight-ninths interest. Specifically, the issues are: (1) whether respondent erred in taxing to petitioner all interest received on a mortgage note, rather than one-fourth thereof as conceded on brief by petitioner; (2) whether respondent erred in allocating eight-ninths of rental income to petitioner, rather than one-fourth as reported; (3) whether respondent erred in allocating to petitioner eight-ninths of capital gain on sale of the property, rather than one-fourth as reported; and (4) whether respondent erred by omitting in his computation of the gain from the sale the basis of part of the property sold. Petitioner concedes, on brief, an issue concerning deduction of real estate taxes. Findings *179 of Fact Certain facts have been stipulated and are hereby found. Helen L. Louie and Richard H. Louie, hereafter referred to as petitioner, are husband and wife residing in San Francisco, California. They filed their joint individual income tax return for 1950 with the collector of internal revenue for the first district of California. In 1924 petitioner's mother, Ng Shee, executed a will by which she bequeathed $100 each to seven of her eight children. As to petitioner, the eighth child, her will provided: "Second. I further bequeath all of the rest, remainder and residue of all of my property, either real, personal or mixed, to my son Richard Louie. The reason that I am giving to him more than the others is that I have great confidence in his ability and judgment, honesty and integrity and know that he will be able to care for the property, and will deal justly with his brothers and sisters." Ng Shee had never been gainfully employed, and she never received any gifts or inheritances. She acquired legal title to property solely by reason of her marriage to Louie Hock Bor. The real property held in her name actually belonged to her husband, whose funds had been used in its *180 acquisition. Ng Shee did not read, speak, or understand English. As her husband's attorney read, in English, the will he had prepared, the husband translated it for her into Chinese. In the presence of her brother and the attorney, she signed the will as desired by her husband, who at the same time gave directions that the property was to be divided equally among his sons. Ng Shee told her brother that she and her children were citizens, but her husband was not, and that she held the property in her name for that reason, although it really belonged to her husband. The will was intended, she added, to allow her husband to take charge if he survived her. If not, petitioner was to follow his father's desire to divide the money equally among the sons. Ng Shee explained to petitioner her reasons for executing the will. She told him that the real estate would go to him because he was the oldest son, and a citizen eligible to hold property. She admonished him that a condition to the bequest was that he unselfishly care for his brothers and sisters. She further told him that his father would retain control as long as he lived, and that any instructions given by his father were to be *181 carried out. Ng Shee died on January 7, 1927, at the birth of her ninth child, Francis. Her husband and her nine children, Minnie, Jeanette, Bessie, Evelyn, Richard (petitioner), Pershing, Walter, Donald, and Francis, survived her. Ng Shee's will was admitted to probate. The inventory of her estate included two pieces of real property in Fresno, California: a business building appraised at $100,000; and a home appraised at $6,000. The executor's final account also included $15,193.29 of rents and other income received after the filing of the inventory. The pretermitted heir, Francis, received, under California law, a one-ninth interest in the residue of his mother's estate. After payment of $100 to each of the other seven children, petitioner received the other eightninths of the residue. Jeanette and Minnie died about 1930 and 1932, respectively, and Pershing died in service during World War II. All three died unmarried without any surviving issue. The estates of none of these decedents as probated are shown to have included any property administered in their mother's estate. On the date described as "Chines [Chines] Republic 17th year, 1st month and 15th day," Louie Hock *182 Bor executed a will by which he bequeathed real and personal property, all located in China, to his nine children by Ng Shee, and to his one son by a prior marriage, Gum Yuen. He divided the real property, a house, among his sons, a cash deposit in a Hong Kong bank among all the children, and five diamond rings among his daughters. Louie Hock Bor also executed a will on "Republic of China, 17th year, Second month and 26th day (April 16, 1928)" in which he listed among his possessions the cash deposit in the Hong Kong Bank and the diamond rings, but not the house in China. In addition, he listed a two-story building at Fresno, California (previously referred to in Ng Shee's will), stock certificates of two Hong Kong companies issued in his own name, a cash deposit with one of those companies, funds held by a brother, and "Properties under the Name of my Deceased Wife Louie Ng Shee." The latter category included a home in Fresno (previously referred to in Ng Shee's will), stock and a cash deposit in a Canton company, and cash deposited with a Hong Kong bank. The will provided for equal distribution of the income from the Fresno building among the five sons of Ng Shee. If sold, the *183 proceeds were to be divided into equal shares for the five sons and Gum Yuen. The cash deposit referred to in both wills was combined with the deposit with the Hong Kong company and the funds held by his brother, totaling HK [1] $61,500. From that combined fund, augmented by rental income as necessary, HK $14,000 was given to each of the five sons, HK $2,500 each to Gum Yuen, Minnie, and Evelyn, and HK $1,500 to Jeanette and Bessie. Of the stock certificates of one Hong Kong company, each of the five sons was to receive HK $1,000 and Gum Yuen, HK $2,000. The remainder of that stock and stock in the other company were not distributed, but reserved for future ancestral worshipping. The diamond rings were distributed as in the March 4 will. Property held in Ng Shee's name went to her five sons in equal shares. Louie Hock Bor died on August 25, 1928. The will dated "17th year, 1st month and 15th day" was admitted to probate. The will dated April 16, 1928 was never filed for probate. The exact nature and value *184 of the assets referred to has not been disclosed. During the 1930's all of Ng Shee's children spent varying periods of time in China, where the younger children were educated. While there, they drew on their father's assets located in China for support. Petitioner sent an undisclosed amount of money from rental proceeds to China to help support his brothers and sisters. Some stock and deposits in China became worthless due to destruction of the companies by the Japanese. When their father died, only Minnie had reached 21 years of age, petitioner being 19. On attaining his majority he became head of the family. All the brothers and sisters, when not in China, resided with him. In 1941 petitioner purchased a residence in San Francisco in his name and that of his wife, using funds earned by the Fresno property. All surviving brothers and sisters lived there as well as petitioner and his wife. In 1945, in connection with their divorce, petitioner's wife released any interest in that property. The property was later placed in the names of all the brothers. Walter was never gainfully employed from 1930 until 1950, except for several years during the war. Francis never worked until *185 1948 or 1949. Donald never worked until he returned from service and then not steadily. Pershing worked for a year or two before he entered the service. Petitioner did not work steadily. None of the sisters ever worked at all. All family support prior to May, 1950, aside from the income from employment, came from the Fresno real estate. After his mother's death, petitioner occasionally assisted his father in collecting rents. Collections were given to his father who deposited them with the bank, the executor of Ng Shee's will. The father managed completely all rents and property. After Louie Hock Bor died, Minnie collected rents, managed the family affairs, and disbursed money for the family. Prior to her death, she turned over to petitioner all books, papers, and stock certificates. Thereafter he managed the family affairs, collected rents, controlled the income from the Fresno property, and disbursed money for the benefit of the family. Petitioner kept the rental income either in cash or his personal bank account and did not segregate his personal funds. He never accumulated any substantial surplus funds. From time to time, he borrowed money to meet the needs of the family or *186 of individual members thereof. From 1945 through 1947 petitioner reported all the income from the Fresno property. For 1948 and 1949 he reported eight-ninths of the income from the property on his personal returns. He computed his own tax liability for those years, and assisted Francis in computing the tax on a one-ninth share of the income. On May 3, 1950 petitioner sold the Fresno rental property and the Fresno home for $180,000. The buyer paid $80,000 cash and executed a 2 per cent note for $100,000 secured by a deed of trust. Depreciation allowed or allowable from the date of acquisition to the date of sale was $33,893.60. The sellers paid sale costs totaling $864.95. After payment of the expenses and a note secured by the property, the remaining $70,390.42 [2] was paid in two checks: $62,569.26 to petitioner, and $7,821.16 to Francis. Petitioner deposited both checks in his bank account. In 1950 petitioner and his three surviving brothers each reported one-fourth of the total gain on the sale of the Fresno property as capital gain on their individual income tax returns. In order to compute the four 1950 *187 returns, he furnished to the accountant the necessary information, including his tax returns for prior years, which disclosed the division of the income from the Fresno property. From the sale proceeds, petitioner paid $10,000 each to Gum Yuen, Bessie, and Evelyn. He paid off a mortgage loan taken jointly by the brothers on the San Francisco residence, a loan on an insurance policy, a loan to Francis for opening a business, and several personal loans used for family maintenance. Out of the remainder he obtained four cashier's checks to pay the Federal income taxes for each brother. The remainder was distributed $3,445 to each of the four brothers, increased or decreased by any advances made. The Fresno property produced income of $4,535.05 in 1950 prior to the sale. Petitioner reported one-fourth on his return, as did each of his three brothers. The distribution to various relatives from the sale proceeds was based on the following premises: Gum Yuen had received advances from petitioner from the assets in China and income from the Fresno property estimated to exceed $20,000. The $10,000 payment was in complete settlement of his claim to HK $4,500 and one-fifth of the Fresno *188 property under Louie Hock Bor's second will. The brothers did not pay $10,000 to each of the two surviving sisters pursuant to instructions in their father's will, but considered the payments to be gifts. Petitioner and his brothers and sisters owned the San Francisco residence. He claimed a deduction in his 1950 return for the entire property taxes levied. In 1952 petitioner borrowed $50,000 using the deed of trust on the Fresno property as security. Payments on the $100,000 deed of trust went directly to the bank to repay the 1952 debt. After repaying a prior loan, paying service charges, interest on loans, and building expenses, he gave Bessie a second $1,500 to complete the purchase of her interest in the San Francisco residence. Evelyn received $3,000 for her share in 1951. From the remaining proceeds of the loan, petitioner set aside $15,000 to maintain the residence. Each brother received one-fourth of the $33,226.90 residue after charging or crediting his share with any advances he had made or received. The provision of Ng Shee's will granting the property to petitioner was intended to designate a successor-trustee for the property which she held in trust for Louie Hock *189 Bor, the true owner. Petitioner's conduct during 1928 through 1950 was that of a trustee of the trust created by his father in the Fresno property. Opinion Although statement as an alternative theory is not clearly articulated in petitioner's brief and is ignored by respondent, we think the only permissible interpretation of the facts as they appear from the record as a whole is the one originally outlined by petitioner's counsel in his opening statement at the hearing: "It is our contention in this case that the mother was holding this property belonging to her husband, who was an alien and ineligible to hold real estate, simply because the husband wasn't able to hold the title to the real estate. Although she left the will whereby she transferred the property - as far as the record title was concerned - to her son Richard, that in fact it was passed on to him to hold it as she held it for the benefit of his father, and in turn, when his father passed on, his father left him a written document which is in form eligible for admission to the State of California under which the son was instructed to provide for a home for the minor children until they had grown." What evidently *190 happened was that petitioner's mother who never had any property of her own was made trustee of property of her husband because she was a citizen and he an alien Chinese. Under the law of the State of California, as it then appeared upon the statute books, neither legal nor equitable title to property could validly repose in a Chinese national. Act 261, General Laws of California; . It was thus entirely reasonable for petitioner's father to create an oral trust and the evidence in this respect is convincing and uncontradicted. [3] That the Alien Land Law which occasioned the creation of the trust was declared unconstitutional after the death of petitioner's father and mother, , merely removes the necessity for our consideration of the influence of a conveyance which is contrary to effective local law. *191 Once it is assumed that the property belonged originally to petitioner's father, that the latter made his wife trustee, and that she died while the father was still alive, the remainder of the demonstrated facts become entirely consistent. Record title was left by the mother's will to petitioner as the eldest son. This she could safely do because he also was a citizen. [4] The father's probated will made no reference to the property presumably for the same reason that the trust was originally created: namely, that he could not safely refer to his ownership of any equitable interest in property. But a document executed only a short while later, apparently valid as a will but never probated, gave instructions to petitioner which his father might properly have given to any trustee. Since petitioner was a minor when his father died the property was first administered by his oldest sister but without alteration of the status of the record title. And when it became possible petitioner took over the duties of trustee and has acted in that capacity since. Our conclusion of fact accordingly is that a trust was created of which petitioner was trustee and that, while petitioner was one of the *192 beneficiaries, the remainder of the property was held by him not for himself but in a fiduciary capacity, and we have so found. It is no obstacle to this conclusion that the original trust was not in writing, , or that there may have been an inartistic reference to the imposition of the trust obligation. ; . From the latter case, which arose in California, there was quoted in the former the following less specific language as being adequate to create a trust (): "I recommend to her the care and protection of my mother and sister, and request her to make such provision for them as in her judgment will be best." Respondent, in effect, concedes that a trust may validly be created notwithstanding *193 these limitations. And that petitioner accepted the property as successor-trustee with knowledge of the trust is enough to bind him to the performance of the original trust obligation. Respondent does, however, contend that petitioner's conduct has been incompatible with that of a fiduciary. He refers, for example, to the filing of tax returns in which petitioner reported the entire income from the trust property, to the absence of any formal accountings, and to a certain vagueness in the treatment of the trust proceeds. We think, however, that the testimony of petitioner adequately shows that he did in fact perform his duties as trustee which were primarily to furnish a home for his brothers and sisters and ultimately to divide the property among his brothers and himself. Certainly there has been no such deviation from the main scope and objectives of the trust as to justify treating petitioner's conduct as evidence that no trust existed. One additional issue is not pressed by respondent. The evidence satisfies us that petitioner's position was correct. The basis of part of the property sold should properly have been deducted from the gross *194 proceeds. Another question argued by petitioner will not be considered since it was not raised in the petition. We think the deficiency erroneous, except for that item and petitioner's concession. Decision will be entered under Rule 50. Footnotes
1. Hong Kong currency. According to petitioner's testimony, the exchange rate of Hong Kong dollars for United States dollars was about 3 to 1 in 1928, and about 4 to 1 in 1950.↩
2. Including a pro rata portion of tax credited to the seller.↩
3. Richard Quong, Ng Shee's brother, testified as to the circumstances under which his sister had executed her will: Q. And what other discussion took place, if any? A. Well, I don't exactly remember what took place, but after all the sister told me, told us that, well, if that is the way he wants it, it is alright with her because, after all, it is his money, and he signed the will. Q. By "he," who do you mean? A. Her husband. * * *
Q. Mr. Quong, I must say you are a little bit vague in your "he's." She said that she was holding the property because her husband was not a citizen and she was; did you say that? A. Yes. Q. And that it was actually his property? A. Actually his property.↩
4. Richard Quong also testified: Q. Did she tell you why she was leaving all of the real estate to her oldest son, Richard? * * *
THE WITNESS: Yes. She told me that the purpose of that was because the will willed to her is actually not her property, only doing that because he is a citizen.↩